**Affirmed and Opinion filed March 31, 2020.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-18-00328-CV

---

### JOHN R. FULLER, Appellant

### V.

### WHOLESALE ELECTRIC SUPPLY COMPANY OF HOUSTON, INC., Appellee

---

**On Appeal from the 270th District Court
Harris County, Texas
Trial Court Cause No. 2016-82422**

---

## O P I N I O N

A former employee appeals the trial court's summary judgment dismissing his claims against his former employer, a supply company, based on an alleged decades-old oral promise made to him by the company's founder. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

In 1986, appellant/plaintiff John R. Fuller served as Vice President and Branch Manager of Nunn Electric Supply Company's Houston location. Fuller had

opened the company's maintenance and repair order ("MRO") branch in Deer Park, Texas, in 1981, and had run the department for four years. At the time, appellee/defendant Wholesale Electric Supply Company of Houston, Inc., also in the electric supply industry, was considering building an MRO operation in Deer Park.

Clyde Rutland, the owner, founder, President, and Chairman of the Board of Directors of Wholesale, met with Fuller several times to discuss a potential MRO operation at Wholesale. Fuller said that he could bring with him a team of approximately 15 employees from Nunn along with Nunn's major MRO customers. Fuller told Rutland he could modernize and computerize Wholesale's MRO operations and then turn over the Deer Park branch to another employee, Jeff Woodward. Fuller asked Rutland for two percent of the stock of Wholesale. Rutland did not agree to give Fuller two percent of the stock. Instead, according to Fuller, Rutland orally promised to pay Fuller "the equivalent of 2% of [Wholesale] when [Fuller] retired" (the "Two-Percent Agreement"). The two men shook hands, and Rutland told Fuller "my word is my bond." They did not put the Two-Percent Agreement in writing.

After the meeting, Rutland mentioned the agreement to Joe Jones, a Wholesale executive. Fuller told Woodward, his subordinate from Nunn, that he had reached an agreement with Rutland. Fuller continued to work for Wholesale for the next 25 years.

Following Rutland's death in 2011, Rutland's daughter, Pam McKellop became Chairman of Wholesale's Board of Directors and consolidated the ownership of Wholesale. Fuller approached McKellop about the Two-Percent Agreement. Wholesale denied Rutland had ever made the Two-Percent Agreement and refused to pay the amount Fuller sought.

2

## *Fuller's Claims*

Fuller filed a lawsuit against Wholesale, asserting a claim for breach of the Two-Percent Agreement, and in connection with that claim Fuller set out the communications between Rutland and Fuller leading up to the formation of the alleged contract. The timeline of the alleged acts, statements made, and surrounding circumstances leading to the formation of the deal, as alleged in Fuller's live pleading, are as follows:

### August 29, 1986

"Fuller met with Rutland to propose to [Wholesale] his offer to build a successful MRO operation at [Wholesale] with the team and the customers he would bring from Nunn."

"Fuller promised to bring members from his team, customers, and the technical knowledge necessary to sustain the operation in exchange for two percent (2%) of the stock of [Wholesale]."

### August 30, 1986

"Rutland, Fuller, and others met to discuss the proposed deal further"

### September 2, 1986

"Fuller and Rutland met to finalize their agreement. Fuller again mentioned he was willing to do what they had previously discussed in exchange for two percent (2%) of [Wholesale]."

"Rutland told Fuller he was not willing to issue Fuller stock certificates at that time because when he had done so in the past with other employees, some had left without fulfilling their obligations."

"Fuller assured Rutland he was not going anywhere and planned on staying at [Wholesale] until he retired. Rutland then agreed and promised Fuller he would be paid the equivalent of two percent (2%) of [Wholesale] when he retired."

In his petition Fuller alleges that immediately after the parties reached the Two-Percent Agreement, Fuller proposed involving lawyers and memorializing the agreement in writing, and Rutland assured Fuller "My word is my bond," after

which Rutland and Fuller shook hands.

Fuller alleges that, after the parties entered into the Two-Percent Agreement, Fuller began working for Wholesale and brought approximately 15 employees from Nunn to work for Wholesale. Fuller claims that his team retained key customers from Nunn as Fuller had promised.

Fuller alleges that in 2002 Wholesale privately acknowledged Fuller's full performance. Fuller alleges that he talked with Rutland about their agreement and requested that they reduce it to writing, but that Rutland did not want to do any paperwork related to ownership at that time. Fuller claims that Rutland told him that Fuller had "done everything he had asked him to do and had earned his two (2%) of the company." Fuller alleges that in 2002 Wholesale publicly identified Fuller as an owner of the company based on a reference in a Dunn & Bradstreet report in which Fuller contends he was "identified as an owner of the company."

In addition to his breach-of-contract claim, Fuller asserted claims for promissory estoppel, quantum meruit, fraud, and a purported claim for "substantial performance." Fuller also sought to avoid the application of the statute of frauds to the Two-Percent Agreement based on the doctrines of full performance, partial performance, and promissory estoppel.

*Wholesale's Motion for Summary Judgment*

Wholesale filed a motion for summary judgment, challenging all of Fuller's claims. In its motion, Wholesale asserted that the statute of frauds contained in section 26.01(b)(6) of the Texas Business and Commerce Code bars enforcement of the Two-Percent Agreement and therefore Wholesale is entitled to judgment as a matter of law as to each of Fuller's claims, including his breach-of-contract claim. Wholesale argued that the alleged Two-Percent Agreement violates the statute of frauds because its material terms require performance beyond one year

4

from the date Fuller and Wholesale allegedly shook hands. In connection with Wholesale's statute-of-frauds argument Wholesale asserted various traditional summary-judgment grounds in support of the proposition that the doctrines of substantial performance, partial performance, and promissory estoppel do not allow the Two-Percent Agreement to escape the application of the statute of frauds. Wholesale also asserted various traditional summary-judgment grounds challenging Fuller's claims for promissory estoppel, quantum meruit, fraud, and a purported claim for "substantial performance."

*Fuller's Summary-Judgment Response*

Fuller filed a response in opposition to Wholesale's summary-judgment motion. In it Fuller relied largely on the same evidence presented in Wholesale's motion, but Fuller also submitted the verified errata-sheet from his deposition and Fuller's post-deposition declaration.

Though most facts are undisputed, in his response Fuller took a narrower view of the oral contract's terms, implicitly discarding Fuller's retirement as a material term. Fuller argued that the oral agreement was performable in less than a year and therefore did not violate the statute of frauds. Fuller also argued that even if his retirement were a term of the agreement, Wholesale's statute-of-frauds argument still would fail because payment upon retirement could have occurred within a year of the handshake deal. Fuller contended that because the parties never agreed to a particular retirement date, the duration of the contract remained indefinite such that Fuller was free to retire at any time.

Fuller responded to the legal grounds Wholesale asserted concerning substantial performance, partial performance, and promissory estoppel and took a contrary view of the case law upon which Wholesale relied. In his summary-judgment response, Fuller briefly set out the elements of a promissory-estoppel

5

claim and recited facts that he contended would raise a fact issue. In the response Fuller also addressed Wholesale's attacks on his fraud claim and quantum-meruit claim.

*Summary Judgment*

The trial court issued an order granting summary judgment, dismissing all of Fuller's claims, without specifying any summary-judgment ground. Fuller timely appealed.

## II. STANDARD OF REVIEW

In a traditional motion for summary judgment, if the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine, material fact issue sufficient to defeat summary judgment. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000). In reviewing a no-evidence summary judgment, we ascertain whether the nonmovant pointed out summary-judgment evidence raising a genuine issue of fact as to the essential elements attacked in the no-evidence motion. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 206–08 (Tex. 2002). In our de novo review of a trial court's summary judgment, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007). When, as in this case, the order granting summary judgment does not specify the grounds upon which the trial court relied, we must affirm the summary judgment if any of the independent summary-judgment

6

grounds is meritorious. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex. 2000).

### III. ANALYSIS

Fuller presents a single issue on appeal in which he asserts that the trial court erred in granting summary judgment. Under this issue Fuller raises the following questions:

- Did the trial court err in dismissing Fuller's breach-of-contract claim based on Wholesale's affirmative defense of statute of frauds?

- Did the trial court err by dismissing Fuller's purported substantial-performance claim?

- Did the trial court err by dismissing Fuller's promissory-estoppel claim?

- Did the trial court err by dismissing Fuller's fraud claim?

- Did the trial court err by dismissing Fuller's quantum-meruit claim?

We address these questions and associated points in our discussion below.

### A. Did the trial court err in dismissing Fuller's breach-of-contract claim based on Wholesale's affirmative defense of statute of frauds?

Fuller first argues that the trial court erred in granting summary judgment on his breach-of-contract claim based on Wholesale's statute-of-frauds defense. Under section 26.01(b)(6) of the Texas Business and Commerce Code, "an agreement which is not to be performed within one year from the making of the agreement" is not enforceable unless it is in writing and signed by the person to be charged with the agreement or someone authorized to sign for that person. Tex. Bus. & Com. Code Ann. § 26.01(a), (b)(6) (West 2005); *Metromarketing Services, Inc. v. HTT Headwear, Ltd.*, 15 S.W.3d 190, 195 (Tex. App.—Houston [14th Dist.] 2000, no pet.). The application of the statute of frauds to a given contract is a question of

7

law. *Id.*

The statute of frauds in section 26.01(b)(6) does not apply when "the parties do not fix the time of performance and the agreement itself does not indicate that it cannot be performed within one year." *Niday v. Niday*, 643 S.W.2d 919, 920 (Tex. 1982). Conversely, when, either because of the agreement's terms or the nature of the required acts, the agreement cannot be performed within one year, the statute of frauds applies and renders any non-complying agreement unenforceable. *Metromarketing Services, Inc.*, 15 S.W.3d at 195.

We presume for the sake of argument that Fuller's promised performance under the Two-Percent Agreement could have been performed within a year, and consider whether Rutland's alleged promise was a material term, and if so, whether that term could have been performed within a year. Fuller contends that under the oral agreement, there was no requirement that Wholesale pay Fuller upon his retirement; in the alternative, Fuller argues that payment upon retirement was not a material term of the oral agreement. In ascertaining the terms of the oral agreement, we look to the communications between the parties and to the acts and circumstances surrounding these communications. *See Reinhardt v. Walker*, No. 14-07-00304-CV, 2008 WL 2390482, at *2 (Tex. App.—Houston [14th Dist.] June 12, 2008, pet. denied) (mem. op.); *Wiley v. Bertelsen*, 770 S.W.2d 878, 882–83 (Tex. App.—Texarkana 1989, no writ).

In his live petition Fuller alleges that he had first offered to bring to Wholesale the members of his team, customers from Nunn, and the technical knowledge necessary to sustain the operation in exchange for two percent of the stock of Wholesale. In his live pleading Fuller alleges that Rutland refused to issue Fuller stock certificates at that time. But, Fuller claims that after he assured Rutland that he was not going anywhere and planned to stay at Wholesale until he

retired, Rutland agreed that Wholesale's performance under the oral agreement would be to pay Fuller "the equivalent of two percent (2%) of [Wholesale] when [Fuller] retired." Fuller made statements in his deposition[1] and in his post-deposition declaration[2] substantially similar to the allegations in his petition. In all three — the live pleading, Fuller's deposition, and his declaration — payment of two percent of Wholesale when Fuller retired is the last term of the oral agreement, and, in each instance, Fuller says the parties agreed to this term after "Fuller assured Rutland he was not going anywhere and planned on staying at Wholesale until he retired." So, based on the communications between Fuller and Rutland as well as the acts and circumstances surrounding these communications, we conclude that a term of the alleged oral agreement on which Fuller bases his breach-of-contract claim was that Wholesale would pay Fuller two percent of Wholesale upon his retirement.

Fuller argues that even if the parties agreed that Wholesale would pay Fuller upon his retirement, the agreement as to the timing of the payment was not a material term of the Two-Percent Agreement. We disagree. Implicit in the term that Wholesale would pay two percent of the company upon Fuller's retirement, was that Fuller would have to work at Wholesale *until* he retired. Under the circumstances of this case, we conclude that the "retirement" term addresses an important feature of the agreement — the timing of the payment — and that this term was a material and essential term. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) (stating that contracts should be examined on a case-by-case basis to determine which terms are material or essential); *Parker*

---

[1] "He promised to pay me the equivalent of 2% of the company upon retirement."

[2] "I assured Rutland I was not going anywhere and planned on staying at Wholesale until I retired. Rutland then said Wholesale would pay me the equivalent of two percent (2%) of Wholesale when I retired."

*Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 74 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). Accordingly, if Fuller could not retire after working for Wholesale within a year, the statute of frauds would render the contract unenforceable.

Fuller argues in the alternative that even if payment upon his retirement was an essential term, this term could have been performed in less than a year. Fuller asserts that he could have "retired" early, immediately, or shortly after satisfying his required performance under the Two-Percent Agreement and that he could have "taken his two percent (2%) payment and moved to the Bahamas." Conversely, Wholesale advocates for an interpretation of the alleged contract's retirement term as meaning "normal retirement age." In discussing the meaning of the retirement term, the parties refer to Fuller's testimony about what Fuller thought at the time of the oral agreement, what Fuller thought Rutland meant, and various occurrences after the contract was formed. But we need not resort to extrinsic evidence, and instead must give the retirement term its plain and ordinary meaning unless the contract indicates that the parties intended a different meaning. *See Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009).

Neither party contends that Fuller and Rutledge settled upon an agreed definition for the word "retire" or "retirement". To "retire" means to "leave one's job and cease to work, typically upon reaching the normal age for leaving employment." New Oxford American Dictionary 1491 (3d ed. 2010). The term "early retirement" is defined separately, rather than as a subordinate definition of the words "retire" or "retirement" and means "[t]he practice of leaving employment before the statutory age, esp. on favorable financial terms." New Oxford American Dictionary 545 (3d ed. 2010). If the parties had intended to use the word "retire" as inclusive of "early retirement," which has a particular

10

meaning, they could have done so. *See Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included."). They did not.

Giving the word "retire" its ordinary and plain meaning, we conclude that under the Two-Percent Agreement, the parties intended that Wholesale would pay Fuller when he left employment in the typical manner, at "normal retirement age," not early. *See Laurent v. PricewaterhouseCoopers LLP*, 794 F.3d 272, 281 (2d Cir. 2015) (explaining that a term defined by "normal retirement" does not, in its ordinary meaning, suggest anytime the employer wishes, or whenever an employee leaves a company after a few years on the job).  Had Fuller and Rutland meant anything else, they could have said so. *See Tenneco Inc.*, 925 S.W.2d at 646.

Implicit in the term requiring payment when Fuller retired was that Fuller would work at Wholesale *until* normal retirement age.  *Stiver v. Texas Instruments, Inc.*, 750 S.W.2d 843, 846 (Tex. App.—Houston [14th Dist.] 1988, no writ).  As a 38-year-old father of young children, embarking on a new career with Wholesale, Fuller's normal retirement age remained decades away. A contract based on Fuller's employment until retirement age could not possibly have been fulfilled in less than a year from the date Fuller and Rutland allegedly struck the deal.  *See id.* Because the Two-Percent Agreement was not in writing or signed by Wholesale, the statute of frauds precludes enforcement of it. *See* Tex. Bus. & Com. Code Ann. § 26.01(a) & (b)(6); *Stiver*, 750 S.W.2d at 846; *Kalmus v. Oliver*, 390 S.W.3d 586, 590 (Tex. App.—Dallas 2012, no pet.) (explaining that for purposes of the statute of frauds's one-year provision, a contract's duration term based employee's working life or retirement date can be anticipated).

Fuller argues that the facts of this case trigger one or more recognized exceptions to the application of the statute of frauds.  Under the "full performance"

exception, when one party has fully performed under the contract and the only thing remaining is performance by the other party, the statute of frauds will not bar enforcement of the contract. *See McElwee v. Estate of Joham*, 15 S.W.3d 557, 559 (Tex. App.—Waco 2000, no pet.). But, as Wholesale points out, Texas courts have held that the full-performance and partial-performance exceptions to the statute of frauds do not apply in cases in which the party seeking enforcement of the oral contract is an employee who received compensation in the form of wages for performing the actions allegedly performed under the oral contract. *See Paschall v. Anderson*, 91 S.W.2d 1050, 1051 (Tex. 1936) (full performance); *Chevalier v. Lane's, Inc.*, 213 S.W.2d 530, 533–34 (Tex. 1948) (partial performance); *see also Mercer v. C. A. Roberts Co.*, 570 F.2d 1232, 1237 (5th Cir. 1978) (discussing Texas cases applying this principle). Fuller admitted that he received a salary and bonuses during his employment with Wholesale and failed to provide competent summary-judgment evidence to aid the trial court in ascertaining a meaningful distinction between his regular work and the performance Fuller promised under the Two-Percent Agreement. We conclude that the trial court did not err in implicitly determining that that the full-performance exception did not apply to preclude application of the statute of frauds. *See Paschall*, 91 S.W.2d at 1051.

Fuller concedes in his reply brief that the partial-performance exception is not at issue, but he argues that a general equitable exception (irrespective of full performance or partial performance) barring the application of the statute of frauds is triggered when application of the statute of frauds would result in a fraud on the plaintiff. But the cases upon which Fuller relies for this proposition contradict its application to this case. *See e.g.*, *Meyer v. Texas Nat. Bank of Commerce of Houston*, 424 S.W.2d 417, 426 (Tex. 1968) ("As heretofore pointed out and

demonstrated by the *Hooks v. Bridgewater* opinion,[3] the mere breach of a contract does not amount to the species of fraud which will justify the disregarding of the statute [of frauds]"). Even presuming for the sake of argument that such a stand-alone equitable exception exists, its application in this case would be inconsistent with the opinions cited. In light of the undisputed facts that Fuller was paid a salary every year of his employment and received bonuses, and considering the length of time Fuller had available to memorialize the deal in writing, the number of instances Rutland refused to memorialize the alleged oral agreement in writing, and the time available to Fuller to pursue an alternative path, we will not disturb the trial court's implied conclusion that as a matter of law the purposes of the one-year provision were not so frustrated as to require courts to disregard the statute of frauds on equitable grounds.

The one-year statute-of-frauds provision encourages parties contracting long term to put their agreements in writing. Among the risks the statute of frauds serves to address is the possibility that a party obligated to perform under a long-term oral contract becomes ill, is injured, or dies before performance is due. In the absence of a writing, a successor, like Rutland's successor McKellop, may have no reason to be aware of or make financial preparations for any liability incurred under an oral contract.

Because the Two-Percent Agreement is unenforceable under the statute of frauds and no exception to the doctrine applies, we conclude that the trial court did not err in granting summary judgment as to the breach-of-contract claim.

## B. Did the trial court err by dismissing Fuller's purported substantial-performance claim?

Fuller challenges the trial court's summary judgment dismissing his

---

[3] *Hooks v. Bridgewater*, 229 S.W. 1114, 1116–17 (Tex. 1921).

purported claim for substantial performance. For the substantial-performance doctrine to apply there must be an enforceable contract. *Dave Boothe Const., Inc. v. Johnson*, 705 S.W.2d 204, 206 (Tex. App.—Houston [14th Dist.] 1985, no writ) (stating that the doctrine of substantial performance is an equitable doctrine that was adopted to allow a contractor who has substantially completed a construction contract to sue on the contract rather than being relegated to his claim for quantum meruit). In light of our determination that the statute of frauds precludes enforcement of the alleged oral contract, we conclude that the trial court did not err by dismissing Fuller's purported substantial-performance claim.

**C. Did the trial court err by dismissing Fuller's promissory-estoppel claim or in disregarding promissory estoppel as a counter-defense as a matter of law?**

Promissory estoppel sufficient to remove a contract from the statute of frauds requires that the promisor agreed to sign a document that already had been prepared, or upon whose wording the parties already had agreed, that would satisfy the statute of frauds. *1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 29 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). The evidence Wholesale submitted in support of its summary-judgment motion showed that Fuller is not claiming that Rutland agreed to sign a document that had been prepared or upon whose wording the parties had agreed. Fuller has not alleged such an agreement or submitted any summary-judgment evidence raising a genuine fact issue as to any such agreement. Thus, the trial court did not err by implicitly concluding that promissory estoppel did not provide a basis for not applying the statute of frauds to the Two-Percent Agreement. *See id*. For the same reason, Wholesale was entitled to summary judgment on Fuller's affirmative claim for promissory estoppel. *See Nagle v. Nagle*, 633 S.W.2d 796, 799–800 (Tex. 1982).

14

**D. Did the trial court err by dismissing Fuller's fraud claim?**

Fuller argues that the trial court erred in granting summary judgment on his claim for common-law fraud. Wholesale challenged each essential element of Fuller's common-law fraud claim and also argued that the claim was barred as a matter of law based on the statute of frauds.

Fuller asserts that Rutland promised to pay him two percent of Wholesale when Fuller retired with no intent to perform that promise when Rutland made the promise. Though the determination of the intent element — that Rutland had no intent to perform the oral promise to pay Fuller at the time he allegedly made the promise — is generally an issue for the fact-finder, the fraud claim is not impervious to summary judgment if the evidence of intent is so weak that it creates only a mere surmise or suspicion of its existence and thus amounts to no evidence. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992); *Mays v. Pierce*, 203 S.W.3d 564, 573–74 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

Fuller presented no direct evidence — no notes, no memoranda, and no other statements — indicating that when Rutland allegedly promised him two percent of Wholesale, Rutland had no intention that Wholesale would make good on its end of the deal. Fuller, at least, would have had to put forth circumstantial evidence showing such intent. Breach, or failure to perform as promised, is no evidence that Rutland had no intent to perform when he made the promise. *See T.O. Stanley Boot Co.*, 847 S.W.2d at 222; *Mays*, 203 S.W.3d at 573–74. Some courts have found a party's denial that it ever made a promise is a factor showing no intent to perform when the promisor made the promise. *See Marek v. Lehrer*, 03-17-00509-CV, 2018 WL 6217566, at *6 (Tex. App.—Austin Nov. 29, 2018, no pet.). But Wholesale, with McKellop acting as its vice principal, denied that thirty years earlier Wholesale, with Rutland acting as its vice principal, made the

15

promise. The facts are not particularly suggestive of intent because McKellop's denial of the promise came only after she performed due diligence to uncover an institutional record of the alleged promise. More importantly, during Rutland's tenure as vice principal of Wholesale, when Fuller confronted him about the deal in 2002, Rutland reaffirmed the promise. Though good business practices would suggest that Rutland should have memorialized the promise at least before stepping down from the company, the lack of evidence that he did so does not show that he had no intent to perform when he allegedly made the promise in 1986. The evidence that Wholesale promised Fuller two percent of the company with no intent of performing is so weak that it creates only a mere surmise or suspicion of its existence and thus amounts to no evidence. *See T.O. Stanley Boot Co.*, 847 S.W.2d at 222; *Mays*, 203 S.W.3d at 573–74.

Under the applicable standard of review, because the summary-judgment evidence on the element of intent did not raise a genuine fact issue as to whether Rutland had no intent to perform the promise when he allegedly made it, the trial court did not err in granting summary judgment as to the fraud claim. *See T.O. Stanley Boot Co.*, 847 S.W.2d at 222; *Mays*, 203 S.W.3d at 573–74.

**E. Did the trial court err by dismissing Fuller's quantum-meruit claim?**

We next consider whether the trial court erred when it granted summary judgment as to Fuller's quantum-meruit claim. To establish his claim, Fuller ultimately had to prove that he rendered valuable services for Wholesale and that Wholesale accepted those services under such circumstances as reasonably notified Wholesale that Fuller expected to be paid by Wholesale for the services. *Weaver v. Jamar*, 383 S.W.3d 805, 811 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Wholesale challenged the last element, that Wholesale had reasonable notice that Fuller expected to be paid by Wholesale, specifically payment beyond what Fuller already was paid. Fuller admitted that he was paid a regular salary and bonuses for

the duration of his employment, including during the years that he alleges that he performed under the Two-Percent Agreement. Even if his work benefitted Wholesale, and even if that benefit was significant, proof of that benefit does not also prove that the services were beyond the scope of his employment. *See Richardson v. Stewart & Stevenson Services, Inc.*, 14-09-00559-CV, 2010 WL 4817136, at *5 (Tex. App.—Houston [14th Dist.] Nov. 23, 2010, no pet.) (stating that fact that the plaintiff-employee had "over-achieved" and went "above and beyond the call of duty" in performing his job, for which he was compensated by a salary, does not entitle him to extra compensation); *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 154 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Although the record contains significant testimony regarding the terms of the Two-Percent Agreement and the acts Fuller performed in accordance with its alleged terms, the record does not contain evidence of the reasonable value of Fuller's work for Wholesale with duties coextensive of the acts allegedly required under the Two-Percent Agreement. *See Beverick*, 186 S.W.3d at 154. We conclude that the trial court did not err by granting summary judgment on the quantum-meruit claim. *See Richardson,* 2010 WL 4817136, at *5; *Beverick*, 186 S.W.3d at 154.

## IV. CONCLUSION

Because Fuller has not shown that the trial court erred in granting Wholesale's summary-judgment motion, we overrule Fuller's sole point of error and affirm the trial court's judgment.

/s/     Kem Thompson Frost
Chief Justice

Panel consists of Chief Justice Frost and Justices Jewell and Bourliot.

17